1

1

2            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3
                       - - - - -
4
UNITED STATES OF          )
5 AMERICA,                 )
                          )
6          Plaintiff,      )
                          )  Magistrate Case
7          vs.             )  No. 08-156M
                          )
8 ROGER WESLEY FARRIS,     )
  II,                      )
9                          )
           Defendant.  )
10
                       - - - - -
11
                          U.S.P.O. and Courthouse
12                        9th Floor
                          700 Grant Street
13                        Pittsburgh, PA 15219
                          Friday, March 8, 2008;
14                        3:00 p.m.

15                     - - - - -

16      Hearing on Detention/Preliminary Exam

17                     - - - - -

18    Before:  Magistrate Judge Amy Reynolds Hay

19                     - - - - -

20                        Reported by:

21                        Karen A. Shiel
                          Court Reporter

22
                       - - - - -
23
REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
24 WITHOUT AUTHORIZATION FROM THE CERTIFYING
   AGENCY
25                     - - - - -

2

<u>Counsel Present</u>:

For the Plaintiff:   The United States
                     Government
                     by Soo Song, AUSA

For the Defendant:   Law Office of Paul D. Boas
                     by Paul D. Boas, Esq.

- - - - -

3

1

2                    I N D E X

3                    - - - - -

4

5    WITNESSES:       DIRECT    CROSS   REDIRECT   RECROSS

6

7    K. Rochford       6         25       38

8

9

10   EXHIBITS:            MARKED          RECEIVED

11

12   (NO EXHIBITS WERE MARKED.)

13

14

15

16

17

18

19

20

21

22

23

24

25

4

P R O C E E D I N G S

- - - - -

1

2

3

4          JUDGE HAY:  Good afternoon

5     everyone.  Please be seated.  This is the time

6     that was set for the preliminary examination in

7     the matter and detention hearing matter of The

8     United States of America versus Roger Wesley

9     Farris, II, at criminal complaint No. 08-156M.

10     The Government is represented by Assistant

11     United States Attorney Soo Song, and

12     Mr. Paul Boas has entered his appearance on

13     behalf of the Defendant.

14               Good afternoon, Mr. Boas.

15               MR. BOAS:  Good afternoon,

16     Your Honor.

17               JUDGE HAY:  Ms. Song, you may

18     proceed.

19               MR. BOAS:  Your Honor, could

20     we just have one moment?

21               JUDGE HAY:  Yes.

22               MR. BOAS:  I haven't talked to

23     my client since yesterday.

24               JUDGE HAY:  Okay.

25               (Discussion was held off the

1              Magistrate Hearing

2     record.)

3                  MR. BOAS:  Your Honor, I ask

4     for the slight delay because although we would

5     like to seek release and we are imposing the

6     Government's position on detention and we see

7     that Pretrial Services also recommends release,

8     we are willing, to the extent that it can

9     shorten the proceedings, to waive the probable

10    cause hearing.  If they're one in the same in

11    the Court's view, you would need to make a

12    determination at the probable cause hearing and

13    then I guess we'll proceed, but I think it can

14    be done shorter.

15                In terms of the detention matter, we

16    can do without a witness on the stand.  And

17    then during the course, if either side feels

18    the need to supplement matters, and that can

19    possibly happen, but we're not necessarily

20    seeking a probable cause hearing today.

21                  JUDGE HAY:  All right.  If you

22    want to waive that that's fine.  I'm the one

23    who certainly reviewed the criminal complaint.

24                  MR. BOAS:  We may have very

25    serious defenses at trial and, in fact, we do,

6

1          K. Rochford - Direct

2     but at this stage we can see that there would

3     be probable cause.

4               JUDGE HAY:  All right.

5               MS. SONG:  Your Honor, the

6     Government appreciates that, but I think in

7     terms of how we're going to present evidence on

8     detention, there will have to be some

9     testimony.  So I truncated it to the extent

10    that we are redundant on probable cause, but

11    it's still going to be witness questions.

12              MR. BOAS:  I guess that's up

13    to the Government.

14              JUDGE HAY:  That's fine.

15              MS. SONG:  At this time, Your

16    Honor, the Government calls Kenneth Rochford to

17    the witness stand.

18                  - - - - -

19              KENNETH J. ROCHFORD,

20    a witness herein, having been first duly sworn,

21    was examined and testified as follows:

22              DIRECT EXAMINATION

23    BY MS. SONG:

24         Q.    Please state your name for the

25    record.

1              K. Rochford - Direct

2    A.     My name is Kenneth Rochford.

3    Q.     You are employed how?

4    A.     I'm a senior special agent with the

5    Department of Homeland Security/Immigration

6    Customs Enforcement.

7    Q.     How long have you been with

8    Immigration and Customs Enforcement?

9    A.     I have been with Immigration and

10   Customs as well as the U.S. Customs Service

11   since November of 2000.

12   Q.     Do you have other law enforcement

13   experience?

14   A.     Prior to being hired with U.S.

15   Customs, I was a police officer in Greensboro,

16   North Carolina for five years.

17   Q.     Do you have a current area of

18   specialty in your investigations?

19   A.     Most of our investigations over the

20   past several years have centered around child

21   exploitation and child pornography.

22   Q.     You are investigating Roger Wesley

23   Farris, II, for coercion and enticement of a

24   minor?

25   A.     That is correct.

8

K. Rochford - Direct

Q.    Are you the applicant then on the criminal complaint that was submitted on this charge?

A.    Yes, ma'am.

Q.    Understanding that we are presenting evidence for purposes of detention and not probable cause, I am going to ask you some questions to the extent that there are answers outside the scope of the complaint.  Do you understand, Agent?

A.    Yes, ma'am.

Q.    By way of the narrative in the complaint, Mr. Farris placed a telephone call to an undercover agent; is that correct?

A.    Yes, it is.

Q.    Approximately what time was this on March 4, according to the criminal complaint?

A.    The first call was placed approximately 6:55 that was not answered by the UCA.  A follow-up phone call was placed by Mr. Farris at approximately 7:20 to 7:30 that evening.

Q.    As you detail in the criminal complaint, there was a discussion about sex

9

1                    K. Rochford - Direct

2     with a child; is that correct?

3          A.     Yes, there was.

4          Q.     The age of the child was what?

5          A.     Ten years old.

6          Q.     She was to be what relation to the

7     adult to whom Mr. Farris was speaking?

8          A.     She was stated to be the niece of

9     the adult to whom Mr. Farris was speaking.

10         Q.     How specific was Mr. Farris in

11    detailing what specific sexual acts he intended

12    to engage in with this ten-year-old child?

13         A.     He was very specific and very

14    graphic in his descriptions.

15         Q.     If you would for the Court, what

16    types of things did he detail in specificity?

17         A.     He stated that he would want the

18    ten-year-old girl to perform oral sex on him.

19    He actually stated it in the phone call as he

20    wanted the girl to give him a blow job, and

21    after that he would have sex with the young

22    girl without protection.

23         Q.     By sex, you mean intercourse?

24         A.     Yes, ma'am.

25         Q.     In the course of this conversation,

1           K. Rochford - Direct

2    were there any other ground rules, for lack of

3    a better phrase, as to what Mr. Farris would

4    not be entitled to do with this child?

5           A.      The only thing that was set up by

6    the UCA was that there would be no anal

7    penetration or anal sex.

8           Q.      But any other conduct would be

9    within the scope of this agreement?

10          A.      Yes.

11          Q.      The sum total for Mr. Farris having

12   access to this child was to be what?

13          A.      He stated that he would pay $700 for

14   the act.

15          Q.      In the complaint you state an

16   additional $50 for gas.

17          A.      An arrangement was made later on in

18   the conversation that the UCA "uncle" would

19   bring the girl to Pittsburgh for an additional

20   $50 in gas money.

21          Q.      How much time was Mr. Farris

22   contemplating with this ten-year-old child?

23          A.      Several hours.

24          Q.      That time was intended to be with

25   him and the child or with him and the child and

K. Rochford - Direct

1

2    the adult?

3         A.    Mr. Farris and the child.

4         Q.    Alone?

5         A.    Yes.

6         Q.    Did Mr. Farris and the undercover

7    agent discuss specifically the body type or

8    physical description of the ten-year-old child,

9    the issue in this case?

10        A.    Yes.   During conversation Mr. Farris

11   asked what the ten-year-old niece looked like,

12   and she was described as a little tall for her

13   age, skinny, long brown hair, small breasted,

14   and no pubic hair.

15        Q.    Did Mr. Farris specifically ask

16   about whether she was menstruating?

17        A.    Yes, he did.

18        Q.    What did the undercover agent

19   respond?

20        A.    The undercover agent responded, "No,

21   she wasn't.  She was only ten years old."

22        Q.    Did Mr. Farris elicit whether this

23   child was experienced sexually?

24        A.    Yes, he did.

25                  MR. BOAS:  Your Honor, I

1              K. Rochford - Direct

2      thought I waived the probable cause hearing.

3      I'm not sure how a lot of this deals with

4      matters relevant to the detention once we get

5      past the initial aspect of the age and so

6      forth.

7                  JUDGE HAY:   I'm going to

8      overrule the objection.

9                  MR. BOAS:   Okay.

10     BY MS. SONG:

11         Q.    I'm sorry.   I had asked you whether

12     he had elicited questions about whether this

13     child was sexually experienced.

14         A.    Yes, he did.   He asked the UCA had

15     she ever done anything like this before, and

16     the UCA responded that the uncle was the only

17     one who had experience with the ten-year-old.

18         Q.    Did Mr. Farris ask any questions or

19     express concern about whether this ten-year-old

20     was discreet and whether she would tell any

21     other adults about what happened?

22         A.    Yes.   During the initial

23     conversation, and I believe in a subsequent

24     conversation, he asked if she would keep this

25     quiet.   "Is she going to tell anybody?   Is she

K. Rochford - Direct

going to tell her mother?"  And the UCA agent

stated that in his experience she had not told

her mother.  She had kept it between the two of

them in the undercover capacity.

Q.    Did Mr. Farris express in his

conversation whether he would be able to tell

if this ten-year-old child was, in fact, older,

if an older child were put forth as being a

ten-year-old?

A.    Yes.  In his conversation he stated

that he would be able to tell if the girl was

actually the age he was being told that she

was.

Q.    In the conversation on March 4,

Agent Rochford, did Mr. Farris discuss whether

this was to be a singular occurrence or a

longer-term undertaking?

A.    He said that he hoped that it would

be an ongoing relationship.

Q.    Do you recall any of the specific

verbiage he used with respect to whether this

was to happen once or more than once?

A.    He stated that he hoped that it

would be an ongoing thing, an ongoing

14

K. Rochford - Direct

1

2   relationship.  As a matter of fact, he did

3   state to the UCA to the effect that "I can make

4   you rich if she is what you say she is.  And if

5   she's good then, you know, we can keep this

6   going for quite a while."

7        Q.    What statements, if any, did

8   Mr. Farris make about getting caught by law

9   enforcement or questioning whether the

10  undercover agent was, in fact, a cop or law

11  enforcement?

12       A.    He asked the UCA on two separate

13  occasions in two separate phone calls, "Are you

14  a cop?  Are you sure?  Have you ever had any

15  time with law enforcement?"  And he was told

16  no.

17       Q.    In the first conversation, what was

18  said about when this sexual encounter would

19  occur?

20       A.    Initially, near the end of the first

21  conversation, Mr. Farris asked the UCA, "Do you

22  have the girl tonight?  Do you have her

23  tonight?"  The UCA responded, "No."

24            Referring back to prior in the

25  conversations, "I only got her three days a

K. Rochford - Direct

1    week.  I don't have her tonight.  I have her

2    Monday, Wednesday, and Friday."

3         Mr. Farris stated, "Okay.  Well,

4    I'll call you back in a couple of days."

5         Q.    In fact, on March 5 Mr. Farris and

6    the undercover agent had additional

7    conversations; is that correct?

8         A.    Yes.

9         Q.    And the plan to engage in sex with

10   this child was furthered; is that correct as

11   well?

12        A.    Yes, it was.

13        Q.    Again, trying to focus on things

14   that are outside the complaint as phrased in

15   terms of what was going on with the child when

16   she was supposedly leaving West Virginia to

17   come to Pittsburgh, what was said in that

18   conversation?

19        A.    I don't understand the question.

20        Q.    In other words, what was the timing

21   to be?  What did Mr. Farris understand was

22   happening at her home in West Virginia before

23   she was coming to Pittsburgh?

24        A.    At the time she was to be getting

K. Rochford - Direct

out of school at approximately 3:00, and she

would be transported to Pennsylvania from West

Virginia after she got home from school to the

uncle's house.

Q.    And the uncle was going to bring her

directly from school or what was the plan?

A.    The request had been made that the

UCA stop at a Wal-Mart or that type of store

and purchase a Hannah Montana video, something

Hannah Montana, that this ten-year-old would

like.  The UCA would bring it and give it to

Mr. Farris without the girl knowing about it,

so when Mr. Farris did meet with the

ten-year-old he could present her with a gift.

Q.    Were there any discussions whether

the child needed to be bathed or prepared for

the sexual encounter?

A.    Prior to leaving the house in West

Virginia, the UCA stated that "Before I bring

her, I'm going to give her a bath."  Mr. Farris

stated, "No.  I can do that when she gets

here."

Q.    "Here" being where?

A.    To the hotel in Pittsburgh.

K. Rochford - Direct

1

2          Q.      Which, according to the complaint,

3      Mr. Farris had already obtained; is that

4      correct?

5          A.      Yes.

6          Q.      That was around 5:10 at the Quality

7      Inn University Center?

8          A.      That's correct.

9          Q.      What about planning for when the

10     uncle brought the ten-year-old child to the

11     hotel?  What did Mr. Farris and the undercover

12     agent decide would happen once he arrived?

13         A.      The plan was that the uncle would

14     pull up in his truck, the two would acknowledge

15     each other without actually speaking, but the

16     whole time they were still on the cell phones,

17     that Mr. Farris would walk up to the truck,

18     would be able to see the girl to make sure it

19     was what he wanted, and the UCA and Mr. Farris

20     would speak one on one away from the girl and

21     then the exchange of money and then the girl

22     would be presented for the act.

23         Q.      As you mention in the criminal

24     complaint, Mr. Farris apparently expressed some

25     concern that he could get hung up for this

1                 K. Rochford - Direct

2      conduct; is that correct?

3           A.    Yes.   During one of the phone calls,

4      Mr. Farris stated that he was getting cold feet

5      and that the cold feet was as a result of "If

6      we get caught, we could really get hung up for

7      this."

8           Q.    I just want to be clear.   The cold

9      feet was not expressed as cold feet about

10     having sex with a child, but concern at getting

11     caught?

12          A.    Yes.

13                MR. BOAS:   I'm going to object

14     to the leading nature of this question.

15                JUDGE HAY:   I'm going to

16     sustain it for a different reason.   I don't

17     know that this witness can answer the question.

18          Q.    But in terms of the context of the

19     call, which you have reviewed; is that correct,

20     Agent?

21          A.    Yes.

22          Q.    Can you give the Court a better idea

23     of the context of this cold feet statement that

24     you have referred to?

25                MR. BOAS:   I would object for

1          K. Rochford - Direct

2      the reason that the Court sustained the

3      objection.  This witness really can't read the

4      declarant's mind.

5                    MS. SONG:  I'm not asking him

6      to infer any intent of the speaker.

7                    JUDGE HAY:  Has he seen the

8      transcript of the call?

9                    MS. SONG:  He has listened to

10     the call.

11                    JUDGE HAY:  Okay.

12     BY MS. SONG:

13         Q.     Agent Rochford, can you give more

14     detail about the nature of the cold feet

15     statement by the Defendant?

16         A.     The nature of the cold feet

17     statement was that he was nervous.  There was

18     no mention made that he was nervous about

19     having sex with a ten-year-old.  It was that he

20     was nervous about getting caught by the police,

21     that himself and the UCA, thinking it was the

22     uncle, could get hung up for this, could get

23     arrested, could get in trouble.

24         Q.     On the 5th, did Mr. Farris make

25     additional statements questioning whether the

1              K. Rochford - Direct

2    agent was a cop or otherwise involved in law

3    enforcement?

4         A.    He did ask a second time, the first

5    time being on the 4th and the second time being

6    on the 5th if the UCA was a cop.  Again, the

7    UCA said no and, in fact, questioned

8    Mr. Farris as to whether he was with law

9    enforcement.

10        Q.    Was Mr. Farris using a correct name

11   for himself in these discussions?

12        A.    Yes.  He was referring to himself by

13   his first name, Roger.

14        Q.    Did he describe himself in any other

15   particulars?  Did he say what he looked like,

16   what he did, or where he lived?

17        A.    He stated that he was a professional

18   in Pittsburgh.  I don't recall any height,

19   weight, hair color.  Nothing like that was

20   given.

21        Q.    Now, once Mr. Farris was at the

22   hotel room, the operation moved to that

23   location; is that correct?

24        A.    That is correct.

25        Q.    Would you detail for the Court the

1          K. Rochford - Direct

2     circumstances of the arrest of the Defendant.

3          A.     There was still an ongoing

4     telephonic conversation between Mr. Farris and

5     the UCA.  The UCA had gone into the hotel and

6     as a matter of fact had been told the room was

7     up on the 5th floor.  The UCA proceeded to the

8     5th floor, said that he couldn't see

9     Mr. Farris.  Mr. Farris stated, "I'm down in

10    the parking lot," and began questioning the UCA

11    about "What color vehicle do you have?  I don't

12    see the vehicle out here."

13          He was told it was a Ford F-150

14    pickup truck.  Again, several times he said, "I

15    don't see it out here.  Are you sure it's out

16    here?  I just want to see" -- the name of the

17    girl he had been given was Sarah Jean.  "I just

18    want to see Sarah Jean.  I just want to see her

19    before we do anything."

20          He was expressly told by the UCA

21    "Don't go near the truck without me there.  I

22    don't want you near her without me there."

23          Mr. Farris found the truck, saw a

24    female agent that we had put in the truck,

25    walked over, was still saying on the phone, "I

1              K. Rochford - Direct

2      see her.  I see her.  I'm just going to waive

3      to her."

4                   He was repeatedly told again to stay

5      away from the truck.  At the time of his

6      arrest, he was pounding on the passenger's side

7      window of the vehicle and had reached down and

8      was pulling at the door handle of the truck

9      when he was confronted by police.

10          Q.      Let me ask you a question then.  As

11     you described it then, the original plan was

12     for a transaction to take place in the hotel

13     room between the uncle and the Defendant; is

14     that correct?

15          A.      Yes.

16          Q.      You just described a series of

17     actions by the Defendant that were inconsistent

18     with that plan; is that correct?

19          A.      Correct.

20          Q.      So to the extent that the Defendant

21     was approaching the truck where the

22     ten-year-old was, that was not what had been

23     agreed to with the uncle.

24          A.      That is correct.

25          Q.      That was the point at which he was

1           K. Rochford - Direct

2    arrested; is that correct?

3           A.     Yes.

4           Q.     What items on his person did the

5    Defendant have?

6           A.     On his person, at the time of the

7    arrest, was the hotel key and his cell phone.

8           Q.     In the hotel room what items of

9    evidentiary significance did you find?

10          A.     In the hotel room in a desk drawer

11   was $760 in $20 bills folded up into

12   $100 increments.  They were placed into a cup,

13   which was wrapped in a bag, which was stuck in

14   the desk drawer.  Also, in the nightstand

15   drawer next to the bed was Mr. Farris' wallet,

16   several IDs, including his driver's license and

17   some employment IDs, his wedding ring, and his

18   wallet contained additional currency.

19          Q.     Did you determine whether the

20   Defendant had gotten the hotel room in his real

21   name?

22          A.     Yes, he did.  He had registered in

23   his real name with a personal credit card, a

24   Bank of America credit card.

25          Q.     Have you had occasion to learn

24

K. Rochford - Direct

1

2   whether in his professional capacity the

3   Defendant would see patients?

4        A.    Yes.  We found that Mr. Farris'

5   employment was with UPMC as an assistant

6   professor, but he was employed with the VA

7   Hospital.

8            We had been advised by Veterans

9   Affairs Office of Inspector General that they

10  do believe that he does see patients at the

11  VA Hospital in Pittsburgh.

12       Q.    Have you learned wether or not the

13  Defendant, in fact, has young female children

14  in his home?

15       A.    Yes, he does.  On the night of

16  Mr. Farris' arrest, we had several agents and

17  several officers from Allegheny County go to

18  his primary residence and spoke to his wife and

19  also found that he had two five-year-old

20  daughters and a two and a half or

21  three-year-old daughter as well.

22            MS. SONG:  Those are all my

23  questions, Your Honor.

24            JUDGE HAY:  Mr. Boas, you may

25  inquire.

25

1            K. Rochford - Cross

2                  - - - - -

3              CROSS-EXAMINATION

4     BY MR. BOAS:

5         Q.    Officer Rochford, you referred to a

6     number of telephone conversations, one on the

7     4th and several on the 5th; is that correct?

8         A.    Yes, sir.

9         Q.    How many of these were tape

10    recorded?

11        A.    Most of them were tape recorded.  I

12    would have to go back and get an exact count

13    for you.

14        Q.    I understand that from talking to

15    the Government that, perhaps, the last one you

16    referred to in the parking lot may not have

17    been, if you recall, or wasn't, do you think?

18        A.    Through a recording device on the

19    UCA, the agent's side of the conversation was

20    recorded.  Mr. Farris' side was not recorded

21    due to the fact that in order to record the

22    conversation, you have to have an ear bud in,

23    and the ear bud would have thrown off the

24    undercover.

25        Q.    But you think up until that point

K.  Rochford - Cross

most of the calls were recorded?

A.      Yes, sir.

Q.      Have you listened to these calls?

A.      Yes, I have.

Q.      Do they appear audible from both
speakers' point of view?

A.      Yes, sir.

Q.      Now, would it be fair to say that
the call on March 4 ended with Mr. Farris?
Dr. Farris had indicated to you that, "Okay.  I
have this information.  I'll call you back in a
couple of days."  Is that what you said?

A.      Well, he didn't indicate it to me.
He indicated that to the undercover agent.

Q.      The UCA; correct?  That is what you
said, "I'll call you back in two days" or
something like that?

A.      After he asked if the girl was
available that night and he was told no he
said, "Okay.  I'll call you back in couple
days."

Q.      And of course if he didn't call back
and you never heard from him again, that would
have been the end of it at least in terms if

1              K. Rochford - Cross

2     this was, in fact, a ten-year-old girl?

3          A.     Possibly.

4          Q.     But you called -- or when I say

5     "you" I'm speaking generically as the

6     Government.

7          A.     Okay.

8          Q.     The Government called the next day;

9     correct?

10          A.     Yes, sir.

11          Q.     And told him before he could call

12     back or decide whether to do this, "I have the

13     girl.  She gets out of school at 3:00."  And so

14     on and so forth.

15          A.     The UCA agent did call him and state

16     that the girl was available.

17          Q.     It was at that time the plan began

18     to be formulated for a meeting?

19          A.     Yes.

20          Q.     You mentioned that there was some

21     discussion about buying a Hanna Montana toy.

22          A.     Yes.

23          Q.     Would it be fair to say that it was

24     the UCA who brought up the idea of buying

25     something and Mr. Farris said, "Well, then you

K. Rochford - Cross

pick up something"?  It wasn't his idea, was it?

A.      The UCA agent brought up the fact that the ten-year-old girl likes Hannah Montana, and that was done in the first conversation.

Q.      So this wasn't Dr. Farris' idea to bring up Hannah Montana or even say anything about a present.  In fact, it was the UCA who was to buy the present; is that correct?

A.      At the direction of Mr. Farris, yes.

Q.      After the UCA brought up that she liked Hannah Montana.

A.      Yes.

Q.      On one of these conversations, the second day, you indicated that Dr. Farris was getting cold feet.

A.      He stated he was getting cold feet and that if they got caught then they both could get hung up for this.

Q.      Sure.  He said he was getting cold feet.  He talked about the risk if he got caught, but he said he was getting cold feet; correct?

K. Rochford - Cross

A.    Again, in his own statement he was
getting cold feet at the thought of getting
caught, not at the thought of having sex with a
ten-year-old.

Q.    I understand that, but didn't he say
on several occasions he's not sure that he
wants to do this? "I kind of want to do it. I
kind of don't want to do it"?

A.    No, sir.

Q.    He never said that?

A.    Not that I can recall and not that I
have heard in any of the recordings.

Q.    Do you recall him saying at one
point when the so-called uncle said, "Well, I'm
already here. I'm already close." He kept
saying, "Well, even if I don't do it, you can
have the money"? Do you remember that?

A.    Actually, what the statement was,
"If we do this or if we don't do this, I'll
still give you the money."

Q.    Okay. So for some reason he was
expressing that it may not happen; correct?

A.    His nervousness, yes.

Q.    Well, that's your opinion of it.

1                    K.  Rochford - Cross

2      You were the one who said the statement was "If

3      we do this or if we don't do it, you can still

4      have the money"?

5           A.      Correct.

6           Q.      So he was saying it may happen or it

7      may not happen.

8           A.      Correct.

9           Q.      Would it be fair to say as he was

10     saying this the UCA attempted to convince him

11     that he should do it?  "We are already close.

12     We are already here.  I have already come all

13     the way from West Virginia."

14               Weren't those sort of things said

15     when he started expressing his misgivings about

16     doing this for whatever reason?

17          A.      He stated that when the UCA agent

18     was nearby.

19          Q.      Right.  Right.  That's what the UCA

20     said, and that was a response to his saying

21     "Maybe it won't happen."

22          A.      The text of the conversation was

23     that maybe this would happen, maybe this

24     wouldn't happen, and I would still give you the

25     money.

K. Rochford - Cross

1
2     Q.     Because the UCA was saying --

3     A.     But there was a conversation about

4  "We will still get together and talk about

5  this."

6     Q.     Okay.  I'm not disputing that there

7  was a conversation about getting together.  But

8  Dr. Farris is beginning to express -- and it's

9  more than beginning because he said it in an

10  earlier conversation either cold feet or maybe

11  it won't happen or I'll give you the money

12  anyway.  And the UCA is saying, "Let's get

13  together and talk about it"; "Okay.  We'll talk

14  about it;" correct?

15     A.     Yes.

16     Q.     Okay.  Although not everything

17  that's said by either side is necessarily true,

18  he says at one point, "I have never done this

19  before."  Correct?

20     A.     Correct.

21     Q.     And that's part of his nervousness?

22     A.     Correct.

23     Q.     Part of his misgivings?

24     A.     That I couldn't tell you.

25     Q.     Well, that's right.  Do you recall,

1                    K. Rochford - Cross

2     even though the very last conversation may not

3     have been recorded, the UCA telling you that he

4     said in the parking lot, "I don't want to do

5     this," but, in fact, the reason he was in the

6     parking lot was not so much because he was

7     breaking the rules to get there earlier, but

8     because he was leaving the hotel?

9          A.    No.   The conversation on the side of

10    the wire that we have is that he wanted to go

11    over, and he wanted to see the girl in the

12    truck to make sure that he was getting what he

13    wanted to get.

14         Q.    Do you recall at some point being

15    told what he said was, "I don't want to do

16    this.  I just want to see her.  I want to go

17    over to the truck and see her"?  Not

18    necessarily to see if that's what I want, but

19    "I'm not going to do this.  I just want to see

20    her"?

21         A.    He stated that post arrest, which is

22    pretty much what I would expect him to say.

23         Q.    Well, you don't have a tape

24    recording of what he said, his side of that

25    last call?

1          K. Rochford - Cross

2          A.     No, sir, I do not.

3          Q.     Was there a surveillance of the

4    hotel at some point earlier?

5          A.     Earlier within the day, no, sir.

6          Q.     Well, earlier like within an hour of

7    the incident?

8          A.     Within approximately 20 to 25

9    minutes prior to his arrest there were

10   surveillance agents in the parking lot.

11         Q.     Did they report that at one point he

12   left the room with all of his things, walked

13   around, left, and then came back?

14         A.     No, sir.

15         Q.     Do you recall either on a tape or

16   hearing from the UCA that one of the things he

17   said was "I want out," that expression?

18         A.     No.

19         Q.     Is there a report of this last

20   incident, the one that his side was not taped

21   on?  Would the agent have been asked to write

22   up his recollection of what Dr. Farris said?

23         A.     The agent has been asked to write up

24   his recollection, and he is doing so.

25         Q.     But, of course, the accuracy of it

1          K. Rochford - Cross

2    can't be verified via tape like the other ones

3    because we don't have --

4          A.     Not Mr. Farris' side of the

5    conversation.

6          Q.     But it would be fair to say that the

7    UCA was trained and instructed to try to

8    convince him that if he has any misgivings he

9    shouldn't worry about it.

10         A.     If his only misgivings were about

11   being arrested, then alleviate those fears.

12         Q.     Right.  Or if that was the

13   perception of his misgivings, because we can't

14   always tell what the misgivings are based on.

15         A.     Unless he states them, yes.

16         Q.     Right.  But saying things like "This

17   may happen or this may not happen.  I'll pay

18   anyway," that doesn't necessarily lend itself

19   to an easy interpretation of what's meant.

20         A.     That is correct.

21         Q.     But the agent is still trying to say

22   "Hey, we are already here.  We're in the lot."

23   Describing the truck and so forth.

24         A.     He said, "We're already here."  The

25   description of the truck came when Mr. Farris

35

K. Rochford - Cross

was trying to find the truck with the girl.

MR. BOAS:  Excuse me for one second.

(Discussion was held off the record.)

Q.    Do you recall that when Dr. Farris said, "I kind of want to do this, I kind of don't.  I'm getting cold feet," that the agent said, "When we get there, I'll tell you my feelings about it"?  Do you remember that?

A.    Yes, sir, I do.

Q.    So really the last understanding was that we don't know what he was going to do, but they would at least talk about it when the agent got there?

A.    Yes.

Q.    Now, a search was made of the vehicle that Dr. Farris arrived in; is that correct?

A.    No, sir.

Q.    It wasn't?

A.    No, sir.

Q.    A search was made of the room?

A.    Yes, sir.

1                    K. Rochford - Cross

2          Q.     A search was made of his person?

3          A.     He was patted down for officer

4    safety.

5          Q.     You had him searched incident to

6    arrest?

7          A.     Yes.

8          Q.     Am I correct that no weapons were

9    found?

10         A.     That is correct.

11         Q.     No false ID?

12         A.     That is correct.

13         Q.     He checked in under his real name

14   using a real credit card?

15         A.     Yes, sir.

16         Q.     No videos of obscene in nature

17   either adult or a child?

18         A.     No, sir.

19         Q.     No sex toys?

20         A.     No, sir.

21         Q.     No ropes, handcuffs, nothing like

22   that?

23         A.     No, sir.

24         Q.     And on the phone he used his real

25   name and in the hotel he used his real name.

1                    K. Rochford - Cross

2      He had his ID with him; correct?

3            A.    Yes, sir.

4            Q.    Agent Rochford, you have been doing

5      this for some time; is that correct?

6            A.    Yes, sir.

7            Q.    Have you posed as the undercover

8      agent sometimes?

9            A.    I am certified as an undercover

10     agent, but, no, sir.

11           Q.    But you have listened to a lot of

12     these tapes.

13           A.    I have listened to a few.

14           Q.    You probably reviewed a couple

15     conversations on the internet, instant

16     messages, emails, phone calls and so forth?

17           A.    Chats, emails, yes, sir.

18           Q.    You understand that sometimes

19     conversations take on a fantasy level that

20     don't necessarily equate to what happens in

21     reality?

22           A.    Yes.

23                 (Discussion was held off the

24     record.)

25                 MR. BOAS:  I have no further

1          K. Rochford - Redirect

2   questions.   Thank you, Agent.

3                    JUDGE HAY:   Any redirect?

4                    MS. SONG:   I just want to

5   clarify a few things, Your Honor.

6                    - - - - -

7              REDIRECT EXAMINATION

8   BY MS. SONG:

9        Q.    Agent Rochford, I just want to be

10  clear.   I believe you testified on direct

11  examination that the undercover agent, in

12  discussions with the Defendant, expressed some

13  concern about whether the Defendant was law

14  enforcement or some nervousness about getting

15  caught himself.   Is that a fair

16  characterization of your direct testimony?

17       A.    Yes, ma'am.

18       Q.    On cross-examination by Mr. Boas,

19  you said that the undercover agent was trying

20  to allay some of the nervousness of the

21  Defendant in the calls prior to his arrest.

22       A.    Yes.

23       Q.    On the 5th, the day that the

24  Defendant was actually arrested, did the

25  undercover agent also express trepidation or

1              Magistrate Hearing

2    nervousness or a fear of getting caught in his

3    conversations with the Defendant?

4         A.    Yes, ma'am.

5         Q.    So it wasn't just one side of

6    reassurance "It's okay.  We'll talk about it.

7    Don't worry about it.  It will be fine"?

8         A.    That is correct.

9         Q.    As to whether he had registered for

10   the hotel in his name, I believe you said he

11   had; is that correct?

12        A.    Yes.

13        Q.    Did you learn how many people he had

14   put as occupants at that hotel room?

15        A.    He listed two occupants in the hotel

16   room.

17                  MS. SONG:  That's all I have.

18                  MR. BOAS:  No recross, Your

19   Honor.  Thank you.

20                  JUDGE HAY:  Thank you, sir.

21   You may step down.

22                  THE WITNESS:  Thank you.

23                  (Witness excused.)

24                  MS. SONG:  No further

25   witnesses, Your Honor.

40

1          Magistrate Hearing

2              JUDGE HAY:  Is there any

3     evidence that you would like to --

4              MR. BOAS:  I would like to

5     take a position, if I may.

6              JUDGE HAY:  Absolutely.

7              MR. BOAS:  Your Honor, for the

8     record, present in the Court today is my

9     client's wife and his father.  His father, who

10    is a retired engineer, came in from Virginia.

11    His wife is also a physician.  She's here in

12    Pittsburgh.

13            They live together in the suburban

14    north area of Pittsburgh with three children,

15    that's true.  The children are young children.

16    Suffice it to say that there is no indication

17    whatsoever that there is any sort of threats or

18    problems at home, this is a certain isolated

19    incident.  I don't think there is anything to

20    suggest nor does Pretrial Services apparently

21    feel that there is a reason to suggest nor does

22    the wife, Dr. Farris, suggest that there is any

23    problem with the children.  I just want to note

24    that at the beginning.

25            The issue that's before this Court

1              Magistrate Hearing

2     right now is detention.  I know you will ask,

3     but I received the report from Pretrial

4     Services, who also recommends release, and

5     that's what we are seeking here.  This is sort

6     of -- you know, accepting as true and

7     everything in the light is most favorable to

8     the Government of what was said today.

9              We see a real sad, tragic picture.

10    I'm not trying to denigrate the seriousness of

11    the offense, but we see a guy here who is in

12    his forties and his whole life given to the

13    community.  He has taken a low paying job,

14    relatively speaking medically, to serve the

15    Veterans' community.  He's a research

16    neurologist, very highly regarded.  He's

17    working on and making very serious progress in

18    the treatment of Alzheimer's Disease.  He

19    probably could be making four times what he is

20    making, but he has chosen to go a different

21    route.

22              He has never been in any trouble in

23    his life.  Here is obviously a man who

24    apparently just from the Government's side has

25    demons inside of him that he is fighting hard

1          Magistrate Hearing

2     to repress and had very serious misgivings on

3     this incident.

4          Now, you can call this anything you

5     want.  You can say it's concern with the

6     police, it's concern with being arrested, but

7     this guy is saying that he has cold feet.  He's

8     saying "Maybe I'll do it.  Maybe I won't.  I'm

9     worried.  I don't know that I want to do this.

10    I'll give you the money even if I don't do it."

11    And it comes down to the fact that "We'll talk

12    about it."  And he says, "I just want to see

13    her."

14          Now, one can characterize this any

15    way one wants.  It's bad enough to even get on

16    the phone and make the arrangements, but here

17    is a guy who engages in all this discussion in

18    this initial call, which is serious but may

19    have been more fantasy than reality.  And

20    rather than waiting until he calls back several

21    days later, they call him the next day telling

22    him they're ready to go.

23          He agrees, but then he has

24    misgivings.  He has cold feet.  He may do it,

25    he may not do it.  "I'll pay you anyway."  He's

1              Magistrate Hearing

2    out in the parking lot.  Is he leaving?  Is he

3    not leaving?  He's obviously uncertain about

4    which way to go on this thing.

5              Here's a guy who is about as naive

6    of an offender as it's possible to be.  He

7    registers under his name, uses his credit card,

8    uses his name on the phone, admits he's a

9    professional, and lists that the room is for

10   two.  But in the room, unlike many other cases

11   that I have read about or seen or have been

12   involved in, there is no drugs, no alcohol, no

13   condoms, no sex toys, no videos, no ropes, no

14   anything.  This is a guy who apparently

15   succumbed to some sort of proclivity and then

16   sort of backed away.

17             We will never know what would have

18   happened, but it doesn't appear that it

19   necessarily was going to happen.  I'm not

20   saying that there may not be a conviction here.

21   He may not be guilty of the crime, but there is

22   nothing to indicate that there aren't

23   conditions or combination of conditions that

24   during a period of time between now and trial a

25   resolution in this matter -- it wouldn't

1                  Magistrate Hearing

2       prevent him from either flight or being a

3       danger to the community.

4               I understand that these kinds of

5       cases don't lend themselves to agreement

6       between counsel because of the sort of public

7       nature of them and the political incorrect

8       nature of them.  I'm not suggesting in any way

9       that this isn't a very heinous offense, but

10      unlike many crimes even where we have violent

11      offenders or serious drug dealers, arrangements

12      are made.  This one is usually thrown in the

13      lap of the Court for the lack of a better term.

14              When I was suggesting conditions,

15      including surrendering his passport, I learned

16      he doesn't even have a passport.  This is a guy

17      who has done nothing but work hard all his life

18      for the good of the community, and for whatever

19      reasons and whatever stressors he was

20      experiencing, his ability to completely repress

21      certain feelings he may have temporarily

22      slipped.  But that's in the light most

23      favorable to the Government.

24              If he were released and as the

25      Government suggested, placed on electronic home

1              Magistrate Hearing

2    detection, if he were checking in on a daily

3    basis, if he were ordered and required to

4    receive counseling and treatment and follow any

5    regimen including medication that they suggest,

6    if he were denied the opportunity to have any

7    contact with minor children except his own or

8    even his own temporarily until we resolve

9    issues there, but I'm not sure that's really

10   necessary, I don't see where there is any real

11   danger.

12             No one is considering him a risk of

13   flight.  Without any history of his name coming

14   up on radar anywhere before, without any

15   indication that there is any violent tendencies

16   here, it seems to me that it's consistent with

17   a presumption of innocence to say that there is

18   no condition or combination of conditions for

19   this man not to be reunited with his wife and

20   spend his days preparing for this trial on the

21   outside with as many conditions as the Court

22   feels is necessary to impose.  I think it's

23   unrealistic and unreasonable.

24             Pretrial Services, who is not an

25   advocate for the Defendant as I am, sees it the

1           Magistrate Hearing

2    same way.  They, in a very careful and thorough

3    report, indicated that if he avoids all contact

4    directly or indirectly with persons who are and

5    may become potential witnesses, victims, not

6    associate with children under the age of 18

7    except in the presence of a responsible adult

8    who is aware of the nature of the Defendant's

9    charge, refrain from firearms, from alcohol,

10   destructive devices.  If he had a passport, he

11   would surrender it.  They talk about electronic

12   home monitoring.  It just seems to me that

13   that's adequate.

14           Otherwise, we are just surrendering

15   to the fear and entrapment in society today.

16   It's just easier to be real hard on everybody,

17   particularly guys who are charged with this

18   kind of crime than it is to, perhaps, be

19   reasonable and analyze carefully whether there

20   are conditions or combination of conditions

21   that would adequately take care of the risk of

22   flight and danger to the community.

23           Now that it's known that this charge

24   is pending, now that it's known what occurred

25   and what potentially could have occurred, it's

1                    Magistrate Hearing

2       not difficult to monitor this individual to

3       make sure that during the period of time

4       leading up to trial while he's presumed

5       innocent, a man who's an educated person who

6       has done nothing but give, give, give, to the

7       community, and consistent with the presumption

8       of innocence, that he not spend his days in the

9       Allegheny County Jail.

10                   By the way, a person with these sort

11      of charges is in tremendous risk of danger.

12      It's a known fact that this is not a good place

13      to be for these kind of charges.  You can't

14      help it if you are convicted and sentenced, but

15      with adequate conditions, we can avoid a

16      serious risk to him during this initial period.

17                   I might also say, Your Honor, that

18      my client today, tomorrow, and in the ensuing

19      week, was expecting all sorts of persons from

20      out of the country, who are also experts in

21      this area of Alzheimer's research that he is

22      doing.  He's administering a grant in excess of

23      $2 million.  While it may be that he is not

24      working during this period of time, it's

25      essential that for at least some period of time

1          Magistrate Hearing

2    he engage in all of the necessary steps to make

3    sure other people are in charge of the vital

4    work that he was doing, that this grant be

5    administered properly, that it's shifted to

6    other people, that other administrators take

7    over, that people who were about to meet with

8    him at least be distributed the workload that

9    he was in the process of doing himself.

10            There is more to this than saying

11   this is a bad crime, so let's keep him in jail.

12   I don't have any doubt that the conditions I

13   have talked about and other ones that the Court

14   thinks are reasonable would prevent a risk or

15   harm to the community and a risk of flight.

16            I'm very thankful that are good

17   Pretrial Services Office is able to see through

18   a lot of what would be the emotional and

19   prejudicial aspects of this to come up with the

20   same recommendation.

21            So that's my position, Your Honor.

22   If you need to have any additional information

23   from either his wife or father, they are here

24   and they can answer any of the questions.

25                 JUDGE HAY:  All right.  Thank

1                Magistrate Hearing

2       you.

3                     MR. BOAS:   Thank you.

4                     MS. SONG:   Your Honor, If I

5       pick up where Mr. Boas left off, Pretrial

6       Services has recommended conditions.  As Your

7       Honor is aware, they are precluded in their

8       analysis from considering the instant charge.

9                     In the case of a person like the

10      Defendant who comes forth before this Court

11      without criminal history and without other

12      contacts with law enforcement, they are

13      constrained to recommend detention regardless

14      of what it is that he's charged with.  I know

15      that the Court will bear in mind that their

16      recommendation is, in my opinion, not

17      comprehensive when you take into account all of

18      the facts that are before this Court that bear

19      on danger.

20                    Now, this is a presumption case,

21      Your Honor, under 18 United States Code 3142.

22      This is a crime of violence, and the Court is

23      to presume that there is no combination of

24      conditions that can allay the concern for

25      safety to the community.

1          Magistrate Hearing

2               We believe that on these facts there

3     is clear and convincing evidence of danger.

4     The points that have been made by defense

5     counsel that he's accomplished professionally

6     and that he doesn't have a prior criminal

7     history cannot serve to rebut the presumption

8     of danger, especially in light of the totality

9     of the circumstances in this case.

10              There is nothing fantastic about the

11    facts before this Court.  There is nothing

12    based in fantasy about the conversations that

13    this Defendant engaged in with agents.  I think

14    that his actions in this case speak much louder

15    than his words when you consider the evidence

16    that the Court has heard.

17              He took a series of steps, of

18    concrete steps, to find a ten-year-old child to

19    victimize and to assure her presence at a

20    specific hotel room at a specific hotel at a

21    specific date and time in a specific location,

22    and directed the undercover agent to get her a

23    specific type of gift and then in the hotel

24    room apparently set aside a specific amount of

25    money that was completely consistent with the

1                    Magistrate Hearing

2      negotiated amount of $700 plus $50 for gas

3      extra.  Then he apparently put in an extra $10,

4      took off his wedding ring, and then went

5      outside of a plan that had been developed with

6      the undercover agent to gain access to the

7      child before he was supposed to even within

8      this plan that had been devised.

9                    The testimony is clear that there

10     was to be a transaction.  The adults were going

11     to speak, and then he would have access to this

12     ten-year-old child and at the time of arrest

13     he's approaching the car where he believes a

14     ten-year-old is by herself, and the agent is

15     saying, "You stay away from her," or engaging

16     in this fiction of "We haven't even talked yet.

17     Stay away from her.  She's out in the car

18     alone."  Going over to the car, banging on the

19     window, and arrested as he is grabbing the door

20     handle, those are actions.

21                    Whatever he said after arrest or

22     leading up to it about cold feet, there is

23     nothing consistent with any hesitation in those

24     actions that are before this Court.  This was

25     not a momentary lapse.  When you look at the

1                   Magistrate Hearing

2     facts, this spanned two days, several

3     conversations.  When you string together the

4     series of specific actions that he had to take

5     to get to that point when he was arrested, we

6     think the evidence is overwhelming.

7                   As far as his specific intentions

8     with the child, it is not the Government's

9     intent to introduce them to inflame the Court.

10    The purpose in eliciting specific details about

11    the conversations bears directly on danger,

12    because the specificity shows precisely how

13    dangerous he is because this wasn't a fantasy.

14    He knew exactly what he wanted to do with a

15    child of a precise age.  He had a precise

16    picture of her physically and warned that he

17    would know if she were older than her ten

18    years, perhaps, telegraphing his profession,

19    but not coming right out and saying that he was

20    a doctor, but made clear that he was not going

21    to be duped with an older child.

22                   Again, Your Honor, we ask the Court

23    to consider how wise it was, given this

24    apparently deep dark secret he harbors inside

25    himself about having a sexual desire for

1                    Magistrate Hearing

2      children, how wise he was to go through an

3      adult intermediary.  When you look at the facts

4      of this case, he assured that this was a child

5      who had been sexualized, assured that this was

6      a child who was discreet and wasn't going to

7      tell her mother, and assured that this was a

8      child with some experience with the things that

9      he intended to do.  Given the fact that it's

10     obvious that he used children as sexual

11     objects, Your Honor, we cannot conceive of any

12     condition that can mitigate that danger on

13     these facts given the series of actions that he

14     was willing to take to make it happen.

15              This Court sees other offenses where

16     we have chats among people that could be states

17     away from each other separated by miles, using

18     fake names, describing themselves as very

19     different physically, mentally, and

20     professionally than what they are.  There was,

21     again, nothing fantastic about what the

22     Defendant presented and what his intentions

23     were and what he did.

24              He used his own credit card and

25     rented the room in his own name.  The defense

Magistrate Hearing

1

2    suggests that shows naivete.  I don't think

3    it's for us to ponder what that shows.  There

4    is, again, is nothing to suggest that this was

5    all a fantasy in his mind.

6           As in another factor, Your Honor, I

7    would just ask you to consider that in the

8    initial conversation, desire was not for a one

9    time thing.  His stated desire in talking to

10   the undercover agent was, "I can make you a

11   rich man."  He had a desire for a long-term

12   relationship with a ten-year-old child so he

13   could engage in sexual acts with her.  That,

14   again, is a factor that makes the Government

15   particularly concerned.

16          As far as the factors that are laid

17   out in 3142, Your Honor has heard the weight of

18   the evidence against the Defendant.  There are

19   many recorded calls.  There is concrete

20   evidence, and we suggest that the weight of the

21   evidence is very strong.

22          As far as the history and

23   characteristics of the person notwithstanding

24   any laudable professional accomplishments he

25   may have or the family that he appears to have

1              Magistrate Hearing

2    that's supporting him, there was also a very

3    clear consciousness of guilt, consciousness of

4    illegality, repeated references to law

5    enforcement.  We think that Your Honor can

6    infer in looking at the history and

7    characteristics of the person on the basis of

8    the evidence you've heard that as I said in

9    addition to these, perhaps, laudable

10   accomplishments, he's harboring some very dark

11   urges that he's very capable of segregating

12   from his professional and personal life in

13   acting upon.

14              Regarding the nature and seriousness

15   of the danger to any person, again, Your Honor,

16   that is what the Government is hanging it's

17   head on in this case.  The nature of the danger

18   is simply too great.  This Court is facing a

19   situation where the choice put before you is to

20   detain the Defendant or send him home to a

21   house where he has three young female children.

22   On the basis of everything that you have heard,

23   we think that that is simply a danger that

24   cannot be accommodated with any conditions and

25   ask the detainment of the Defendant.

1          Magistrate Hearing

2                 JUDGE HAY:  I will let you

3     have the last word.

4                 MR. BOAS:  Something comes to

5     mind here.  Ms. Song points out, you know,

6     here's a guy that has these deep dark urges

7     that he on at least one occasion in his

8     40 some years had a hard time suppressing.

9                 You know, one of the interesting

10    problems is, and I'll note and I'll point out

11    to the Court, that my client hasn't had

12    treatment for this in the past.  It's a whole

13    new ball game now.  It's almost as if a person

14    who has a normal life and has a wife and has a

15    family and is well respected in the community

16    and has these urges can't come forward in some

17    respects in our society.  Because as long as

18    it's not known, as long as no one is aware of

19    this, and as long as he can suppress it, he can

20    live a seemingly normal life.

21                Perhaps, if ten years ago or 20

22    years ago he admitted this to himself and to

23    others and had gone into treatment, maybe it

24    would be a different story.  But now it's out

25    in the open.  Now there is nothing that

1          Magistrate Hearing

2   prevents him from taking all of the

3   professional steps necessary to deal with this

4   issue.  Whether it's counseling or medication

5   or therapy or family therapy or group therapy,

6   there's ways.  We know this psychologically and

7   medically that this issue can be controlled and

8   dealt with, but now it's too late in some

9   respects because of the pendency of the

10  charges.  But it's not too late to have the

11  kind of treatment and therapy that this Court

12  will order that he get that would help him

13  avoid the risk that the Government is talking

14  about.

15          I would also point out -- and I'm

16  hesitant to say this because I know after

17  talking to the wife and after talking to my

18  client that there is no risk with his children.

19  But if the Court feels that that argument that

20  he would be going home to three young

21  children -- and the reason I'm hesitant to say

22  it because if the Court's implying to release

23  my client, I feel the best thing for him is to

24  be with his wife and family.

25          If that seems to be a problem for

1                    Magistrate Hearing

2       the Court, at least until that's resolved by

3       Children and Youth Services or some

4       professional who definitively says there is no

5       risk to his children, we have no problem with

6       him staying somewhere else, nor do we have a

7       problem with there being some other adult

8       person around who would agree to report to the

9       Court if he doesn't come home or if anything

10      unusual happens.

11              We are very confident that a series

12      of conditions can avoid any risk of flight or

13      any risk of danger to the community.  We ask

14      the Court to seriously consider this matter and

15      whatever conditions the Court feels necessary

16      along the lines that I suggested or others that

17      in the Court's wisdom it might think of.

18              He's not a guy who needs to sit in

19      the County Jail for the extended period of time

20      it will take and run the risk of endangering

21      himself by people who fancy themselves against

22      child molesters, basically.  We know that

23      that's a true fact.  You hear it all the time

24      and you see it all the time.

25              I hate to bring it up in front of my

59

1                    Magistrate Hearing

2      client and his family, but that is a reality.

3      So I don't think we need to go quite that far

4      in this case.  It's true.  This is one of the

5      presumptions of the case, but we've talked

6      about all of these conditions that would

7      alleviate the risk to the community.  This

8      isn't a guy who has any reason to believe he

9      can't be monitored in a way that will avoid

10     these risks.  He is not some sophisticated

11     street guy who can do all sorts of things.  He

12     is a naive guy.

13               In fact, this whole thing about

14     saying "Are you the police" is to prove how

15     worldly he is.  Nobody who knows anything ever

16     asks that question because it means nothing.

17     "No, I'm not."  "Oh, great.  Now, I can get off

18     because you lied to me."  Nobody who knows

19     anything ever says that.  This is additional

20     evidence of his naivete and lack of experience

21     in this area.  So that's my point, Your Honor.

22               JUDGE HAY:  Let me ask you

23     this question.  Who cares for the children

24     during the day whenever the doctors are

25     working?

1          Magistrate Hearing

2               MRS. FARRIS:  The nanny.

3               MR. BOAS:  A nanny, Your

4    Honor, and the wife works part-time three days

5    a week.  So she's home a lot, and the nanny is

6    home and we can always have an adult home,

7    always.  We can have that person come down here

8    and agree to call the Court or call Pretrial

9    Services if anything happens.  We are willing

10   to do anything to show our good faith and our

11   desire to prove that he's no risk.  He loves

12   his wife.  He loves his family.

13               This is a world-shattering event for

14   this family, but we want to pick ourselves up

15   and do what we can to prove to the Court that

16   he is no danger and begin with the

17   ramifications of this pending charge.

18               JUDGE HAY:  All right.  I need

19   to review the Pretrial Services report, which I

20   have not done.  We are going to take a ten- or

21   15-minute recess while I do that.

22               MR. BOAS:  Thank you, Your

23   Honor.

24               (Short recess was taken.)

25               JUDGE HAY:  We are going to

61

1                    Magistrate Hearing

2    continue this hearing until Monday at 3:00

3    pending the Court's receipt of two forensic

4    reports, but before we adjourn for the

5    afternoon, Mr. Boas, if I can impose upon you

6    to get Dr. Farris' signature on the waiver of

7    the preliminary examination and yours as well.

8                    MR. BOAS:  Thank you, Your

9    Honor.

10                   JUDGE HAY:  Take care of that

11   administrative matter.

12                   All right.  Then we will adjourn,

13   and we will reconvene at 3:00 on Monday.

14                   (At this juncture, the matter

15   was adjourned at 4:55 p.m.)

16

17

18

19

20

21

22

23

24

25

62

1

2                    C E R T I F I C A T E

3

4          I hereby certify that the

5

6          proceedings and evidence are contained

7

8          fully and accurately in the

9

10         stenographic notes taken by me on the

11

12         hearing of the within cause and that

13

14         this is a correct transcript of the

15

16         same.

17

18             S/Karen A. Shiel

19             _____

20

21             _____

22         Karen A. Shiel

23         Court Reporter

24

25