**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **2:08cr145** |
| | ) | **Electronic Filing** |
| ROGER WESLEY FARRIS II | ) | |

## OPINION

Presently before the court is the government's appeal of Magistrate Judge Hay's order releasing defendant under the Bail Reform Act of 1984 subject to a number of restrictive conditions. For the reasons set forth below, the Order of Release (Doc. No. 11) will be affirmed with the following modifications: (1) defendant shall at all times be in the presence of an adult who is familiar with the allegations giving rise to defendant's indictment on the instance offense and has taken an oath to uphold the Order of Release, (2) defendant is restricted to his parent's home except for pre-approved travel to and in Pittsburgh by automobile for consultation with his attorney, medical consultation and treatment, pre-arranged visits with his wife and children as reflected in paragraph 7(v) of the Order of Release, medical consultation and treatment with Dr. Fracher in Charlottesville, Virginia and matters of a like nature that have been pre-approved by his supervising pretrial officer - and (3) defendant shall participate in mental health treatment as directed by pretrial services, which shall include compliance with the treatment plan developed by Dr. Coufal after examination and any referral consultation he deems necessary.

Roger Wesley Farris II ("defendant") was arrested on March 5, 2008, and charged by criminal complaint with a single count of using an instrument of interstate commerce to persuade, induce, entice, or coerce a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b). Defendant's arrest stems from an undercover operation in which he arranged to have sex with a 10 year old minor female. Defendant was arraigned on the charge and a detention hearing was held on March 7 and 8, 2008, before the Honorable Magistrate Judge Amy Reynolds Hay. On March 11, 2008, Magistrate Judge Hay entered an order releasing defendant under a number of conditions, which include: executing a $50,000

unsecured bond; living with his parents in Virginia and traveling to Pennsylvania with an adult who knows the circumstances of the instant charge and the conditions of release; no contact with children including his own without the presence of an adult who knows the circumstances of the instant charge and the conditions of the release; mental health counseling once a week as directed by pretrial services to begin immediately; no possession of a firearm, destructive devise or other dangerous weapon; refraining from excessive use of alcohol; no possession or use of controlled substances unless prescribed by a licensed medical practitioner; restriction to his parents' place of residence except for employment, education, religious services, medical, substance abuse or mental health treatment, attorney visits, court appearances, court-ordered obligations, or other activities as pre-approved by the pretrial services office or supervising officer; reporting any contact with law enforcement; visitation with defendant's children must be prearranged with his wife to ensure suitability of time and place and supervision; consent to the installation of monitoring equipment to all computer and electronic communication devices, consent to the periodic inspection of such equipment, providing the Probation Office with accurate information concerning any computer system or other electronic communication or storage devices, and abiding by all rules of the Computer Restriction and Monitoring Program. Order Setting Conditions of Release (Doc. No. 11) at 1-4.

The Federal Bureau of Investigation ("FBI") received information indicating defendant had expressed an interest in arranging a sexual encounter with a "grade school" aged girl. On March 4, 2008, defendant contacted an undercover agent by cellular telephone who was posing as the uncle of a ten year old female child residing in West Virginia. Defendant sought to ascertain whether the "uncle" would provide access to the child for the purpose of engaging in sexual acts. Defendant expressed his desire to have the child perform fellatio on him and to engage in unprotected intercourse.

During the course of the conversation defendant asked about the child's physical appearance, and was told she was tall for her age, skinny, long brown hair, small breasted, and no pubic hair. Defendant asked whether the child was menstruating and was told she was not.

He asked whether the child had ever done anything like this and was told the uncle was the only one who had experience with her. Defendant asked whether she would keep quiet about the encounter and not tell her mother and was told that in the uncle's experience she had kept it between them. Defendant sought assurance that the child really was only ten years old, and indicated he would be able to tell if she were older.

As part of the plan defendant agreed to rent a motel room for the encounter. Defendant initially proposed $300 to $400 for the encounter, but subsequently agreed to pay $700, plus an additional $50 for the cost of gas in transporting the child to Pittsburgh. He stated that if the child turned out to be as described and was good, then he could make the uncle rich by keeping the arrangement going for quite a while. At the end of the March 4, 2008, conversation defendant asked if the uncle had the child at that time. Defendant was told no, the uncle only had the child three days a week, Mondays, Wednesdays and Fridays. Defendant said: "okay, well I'll call you back in a couple of days."

The undercover agent called defendant on March 5, 2008. He told defendant he would be getting the child around 3 o'clock when she got out of school and could transport her to Pittsburgh after he gave her a bath. Defendant said he could give her a bath when they got to the hotel room. He sough assurances that he would be left alone with the child for some period of time. Defendant asked the "uncle" to stop at Wal-Mart and buy a Hanna-Montana item so defendant could give it to the child as a gift after they arrived.

Defendant rented room 510 of the Quality Inn, University Center, 3401 Boulevard of the Allies, Pittsburgh, Pennsylvania, and stowed away in a drawer $760 he had withdrawn from an ATM machine. Defendant called the "uncle" and told him he had rented the room and wanted the child transported to Pittsburgh as soon as possible so he could have sex with her.

Defendant made additional calls checking on the progress of the "uncle" and child. During these calls defendant sought assurances that the uncle was not a "cop" and at one point indicated he was getting cold feet and expressed his concern that if they were to get caught the two could get "hung up" for going through with the plan. At one point the "uncle" said "well,

I'm already here ... I'm really close." Defendant stated that "if we do this or if we don't do this, I'll still give you the money."   The two then agreed to "still get together and talk about this."

Surveillance was established in the parking lot of the Quality Inn. At approximately 4:45 p.m., defendant was advised that the two were just minutes away.  Defendant directed the uncle to pull in the parking lot and he would walk by while maintaining cell phone contact so he could look at the child.  The two would not acknowledge each other, but would thereafter meet in the hotel room to exchange the cash.

Minutes later defendant was observed in the parking lot while talking on the phone with the undercover agent.  The agent had gone to the fifth floor of the hotel.  Defendant insisted on gaining a description of the vehicle and eventually was told it was a Ford F-150. Defendant indicated he did not see it in the parking lot and was instructed to stay away from the vehicle without the "uncle" being there.  Defendant said he just wanted to see the child "before we do anything."  Defendant eventually located the truck and  saw a female agent who was sitting in the truck.  Believing the child to be alone in the vehicle, defendant  said "I see her - I'm just going to waive to her," walked over to the truck, rapped on the passenger side window, and reached for the door handle.  He was arrested. Thereafter, he claimed he was not going to go through with the planned encounter.

As part of the proceeding below, the magistrate judge, with the consent of both parties, consulted with two psychologists: Dr. King, regarding defendant's risk of danger to himself; and Dr. Coufal, regarding the nature of treatment that potentially was available should defendant be released on conditions.  At the end of the proceeding she concluded that defendant had overcome the presumption and through a combination of conditions there was a reasonable assurance that defendant's release would not pose a danger to the community.

The government insists in its appeal that defendant has not overcome the presumption, is a danger to the community, and the myriad of conditions imposed do not sufficiently eliminate that danger.  It notes that defendant's conduct was planned and carried out over the course of two days approximately seven weeks after it first became known that he had a desire

to have sex with a child, which negates any notion that the offense was a mere momentary lapse. It further argues that defendant has demonstrated his willingness to take action on his desires, thus making the danger very real, and three out of the four pertinent factors to be considered weigh in favor of detention. In addition, similarly charged defendants have been detained in this district. Defendant maintains that the record contains sufficient evidence demonstrating that the combination of conditions under which he is to be released provides a reasonable assurance that he will not pose a danger to the community.

Argument was held before this member of the court on the government's appeal. The order scheduling that proceeding indicated "either party may call the consulted physicians to testify should they desire to do so." The government did not present testimony from either of the psychologists consulted by the magistrate, but instead presented testimony from Special Agent Clemente ("SA Clemente"), an FBI agent working in a supervisory capacity at the National Center for the Analysis of Violent Crimes and lawyer who has considerable law enforcement experience in the identification, classification and apprehension of sex offenders. SA Clemente also is a forensic psychologist and works regularly in the Behavioral Analysis Unit ("BAU") of the Center. The BAU is staffed by supervisory special agents with considerable law enforcement experience and operates as a "think tank" seeking to develop a specified field of knowledge involving violent and sexual crime. The development of this knowledge and the analyses of various studies are undertaken to assist law enforcement. SA Clemente had no first-hand interaction with defendant and his testimony was based entirely on his brief review of the case and discussion with the case agent prior to the hearing.

SA Clemente testified that under the approach employed by the BAU sexual offenders are classified on a "spectrum" ranging from a situational offender, that is one who does not have a particular attraction to children and commits the offense when a situational opportunity presents itself, to the "preferential offender," that is one who has a definite sexual attraction to children and commits the offense based on a long-term and persistent fixation on gratification

of such sexual desires.[1]  From his perspective the risk of recidivism increases as one moves closer to the characteristics of a classic preferential offender and deceases as the offender's specific traits move closer to a situational offender.  The reasoning for this assessment is that situational behavior can be controlled by control of the environment where as preferential behavior suggests the likelihood of prolific victimization, which cannot be controlled by the environment (short of incarceration), with those who prey on adolescent males being the most likely to repeat and those who prey on females outside the family presenting the next highest level of risk.   The specific characteristics of the target victim also factor into the analysis, because younger victims under the age of "sexualization" are more vulnerable and have less awareness of the harm being inflicted.  And from SA Clemente's perspective the best predictor of future behavior is an individual's "pattern of past behavior."

SA Clemente indicated the following aspects of the record as he understood them signaled increased risk from defendant's release: defendant  had at some point described his sexual desire as a feeling of obsession, which was indicative of a deep-seated and long-term preference for sex with young females and suggested that he had fantasized about children over a long period of time; defendant's being conflicted about being caught demonstrated a willingness to risk severe consequences to achieve his sexual desires; defendant's doubling of the money involved similarly demonstrated the importance of attaining his goal; and defendant's request to have a gift to give the child was indicative of "grooming," behavior through which the offender ingratiates himself to the child.  And from SA Clemente's perspective electronic monitoring was not a sufficient safeguard because it only provides accountability after the fact and defendant may still be able to gain access to arcades, malls, and other similar places where he could get access to children.

As previously noted, SA Clemente had no first-hand familiarity with defendant or his

---

[1]For a more thorough synopsis of SA Clemente's credentials, the mission and functioning of the BAU, and the method of classification of sexual offenders used by SA Clemente see United States v. Thomas, 2006 WL 140558 (D. Md., January 13, 2006) (Magistrate Judge Gauvey) at *4 and accompanying footnotes.

personal psychological circumstances, including those underlying his alleged behavior.  SA Clemente has never met defendant's family members.  His testimony was based solely on the account relayed by the case agent.

SA Clemente conceded that electronic monitoring with global positioning tended to reduce the risk posed by defendant's release if it was attached 24 hours a day.  Likewise, being in the presence of an adult charged with upholding the conditions of release would decrease the risk.  Remaining in the house would reduce the risk.  Limiting travel to that conducted in the presence of an adult charged with upholding the conditions of release would reduce the risk.  Obtaining treatment also has the potential to reduce the risk, depending on the characteristics of the specific offender, and those offenders who are conflicted or have guilt about prior inappropriate conduct generally present better candidates for successful treatment. Also, the more an offender wants to be treated tends to correspond to the offender's response to treatment and his or her success in controlling inappropriate behavior.

At the end of the proceeding before this member of the court additional information was requested from the Probation Office and defense counsel was directed to submit a proposed plan of treatment.  As currently presented by Pretrial Services, if released defendant will be supervised by this district and placed on electronic monitoring with active GPS monitoring.  Because of the GPS capacity defendant can be monitored fully while he is (1) in Virginia, whether at home or traveling for treatment, (2) traveling by car to Pittsburgh as necessary, and (3) in Pittsburgh conducting pre-approved activities.  Pretrial Services recommends that defendant be restricted to his parents' home exclusively except for pre-approved treatment or therapy; that travel to Pittsburgh be by automobile only; and activities in Pittsburgh be limited to attorney consultation, therapeutic consultation and treatment with his treating psychologist or psychiatrist, including any treatment consultations recommended by them, and visits with his wife and children.  All visitation with his children would be supervised by an adult familiar with the allegations of case and the conditions of release. Likewise, there would be an adult familiar with the allegations of the case and the conditions of release accompanying defendant during his travel to Pittsburgh and during all activities

undertaken while in Pittsburgh.  Defendant does not object to any of these conditions.

A proposed plan of treatment has been submitted by Robert Coufal, a renowned licensed clinical psychologist specializing in the treatment of  inappropriate behavior committed by sex offenders.  Because Dr. Coufal  has not had the opportunity to conduct the necessary testing and interviewing to formulate an official plan of treatment, he has outlined what he more accurately described as "a plan of intervention."  The plan is "designed to prevent reoccurrence of any deviant conduct through a combination of management and treatment approaches."

Initially, defendant would be seen twice a week with services that have both psychological and psychiatric components.  The providers of these services will adhere to standards in the field such as those of the Association for the Treatment of Sexual Offenders.  Appropriate assessment will be based on the onset, duration, and intensity of any discovered deviant impulses with the goal of clarifying diagnostic issues and implementing a plan to reduce arousal, which may be accomplished through behavioral methods practiced in the field, such as covert sensitization and aversion therapy and possibly a psychiatric component involving the use of psychotropic medication.  Assessment of any onset and degree of sexual preoccupation, if present, would be part of the plan, again with a focus on clarifying diagnostic issues and bolstering the prevention of any reoccurrence of inappropriate or escalating behavior that could lead to relapse, with the scope of such behavior being far more comprehensive than the sort defendant is accused of committing.  Finally, in order to be comprehensive, the assessment will include personality testing and medical testing as recommended by a forensic psychiatrist.  The generated results will be used to refine a specific and individualized treatment plan, which will also be influenced by all revealed pathways into any discovered deviant behavior.  Individual and group therapy usually are also employed in followup treatment.

The availability of pretrial release is controlled by the Bail Reform Act of 1984, 18 U.S. C. §§ 3141-3150.  Under the Act a defendant must be released on his own recognizance or upon execution of an unsecured appearance bond unless the court determines that "such

release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Thus, the initial question is whether the defendant presents either an unacceptable risk of flight or a danger to others. United States v. Sazenski, 806 F.2d 846, 848 (8th Cir. 1986). If the release of the defendant presents such a risk, the judicial officer shall order the defendant's release be subject to conditions or a combination of conditions that suffice to reasonably assure the appearance of the defendant and the safety of the community. 18 U.S.C. § 3142(c). And after a detention hearing held in accordance with § 3142(f) a defendant must be released unless "the judicial officer finds that no condition or combination of conditions of release will reasonably assure defendant's appearance and the safety of any other person in the community." 18 U.S.C. § 3142(e). Only in such cases is detention to be ordered. United States v. Himler, 797 F.2d 156, 159-60 (3d Cir. 1986).

The Bail Reform Act's preference for pretrial release reflects recognition of the value of one of the most fundamental principles upon which our nation was founded: liberty. See Hamilton v. Lyons, 74 F.3d 99, 105 (5th Cir. 1996) ("Due to weighty liberty interests, the typical pretrial detainee is rarely detained prior to trial."). Thus, historically "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987). Against this backdrop "the Act authorizes the detention prior to trial of arrestees charged with serious felonies who are found after an adversary hearing to pose a threat to the safety of individuals or to the community which no condition of release can dispel." Id. (emphasis added).

The purpose of the detention hearing is to determine whether any condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of any other person and the community. 18 U.S.C. § 3142(f). In making this determination, the judicial officer must take into account the available information concerning:

> (1)     The nature and circumstance of the offense charged,
> including whether the offense is a crime of violence
> or involves a narcotic drug;

> (2)    The weight of the evidence against the person;
>
> (3)    The history and the characteristics of the person, including --
>
>> (A)    The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B)    Whether, at the time of the current offense or arrest, the person was on probation, on parole, or another release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law; and
>
> (4)    The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

This court exercises de novo review over the detention order entered by the magistrate judge. See United States v. Delker, 757 F.2d 1390, 1393-95 (3d Cir. 1985). The magistrate judge's decision and reasoning is to be given careful consideration where a transcript of the detention hearing is available, id., even though the standard of review removes any obligation to accord deference to the magistrate judge's findings and decision. See United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1990). This court may make its independent determination based solely upon the evidence introduced at the prior hearing. Delker, 757 F.2d at 1395; Koenig, 912 F.2d at 1193 ("Clearly, the district court is not required to start over in every case, and proceed as if the magistrate's decision and findings did not exist."); United States v. Torres, 929 F.2d 291, 292 (7th Cir. 1991) (district court may base its findings on transcript of the hearings before the magistrate judge). Of course, it may also consider any additional evidence or proffers submitted in conjunction with any supplemental proceedings.

The government bears the burden of proving the defendant either presents a risk of flight or a danger to the community. The government must prove the defendant is a risk of flight and that no condition or combination of conditions will assure his appearance at trial by

a preponderance of the evidence. United States v. Himler, 797 F.2d 156, 161 (3d Cir. 1986). The government must prove the defendant is a danger to the safety of any other person and the community by clear and convincing evidence. 18 U.S.C. § 3142(e); Salerno, 481 U.S. at 751; Delker, 757 F.2d at 1399.

Where the record reflects probable cause to believe the defendant has committed a crime of violence or an offense for which a maximum term of imprisonment of ten years or more is prescribed by the Controlled Substances Act, 21 U.S.C. § 801 et seq., the Bail Reform Act creates a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person in the community. 18 U.S.C. § 3142(e); United States v. Perry, 788 F.2d 100, 106 (3d Cir. 1986). Through the presumption Congress recognized that persons charged with violent or major felonies present a significant risk of continuing to engage in established patterns of criminal activity and thus pose a significant risk of pretrial recidivism. United States v. Strong, 775 F.2d 504, 508 (3d Cir. 1985).

The Bail Reform Act was amended on April 30, 2003, to include a presumption of detention in most cases involving sexual offenses against children. Known as the "Protect Act", the amendment created a presumption of dangerousness against individuals who, like defendant, are charged with violating 18 U.S.C. § 2422. This presumption was based in part on the congressional determination that "sex offenders and child molesters are four times more likely than other violent criminals to recommit their crimes." Comments of Chairman Lemar Smith, H.R. Rep. 5422.

A defendant may rebut the presumption by presenting "some credible evidence" that he will not pose a threat to the community upon his release. United States v. Carbone, 793 F.2d 559, 560 (3d Cir. 1986) (to rebut the presumption "[t]he defendant must produce some credible evidence forming a basis for his contention that he will appear and will not pose a threat to the community.") (citing United States v. Jessup, 757 F.2d 378 (1st Cir.1985)); United States v. Giampa, 755 F. Supp. 665, 668 (W.D. Pa. 1990). But even when the defendant has come forward with evidence sufficient to rebut the presumption, "the presumption does not disappear entirely, but remains a factor to be considered among those

weighed by the district court." United States v. Abad, 350 F.3d 793, 797 (8th Cir. 2003)

(quoting United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v.

Chagra, 850 F. Supp. 354, 358 (W. D. Pa. 1994) (Diamond, J.) (the presumption once rebutted

does not disappear, but "remains in the case as an evidentiary finding militating against

release, to be weighed along with other evidence relevant to the factors listed in § 1342(g).")

(quoting United States v. Dominquez, 783 F.2d 702, 707 (7th Cir. 1986)).

After careful consideration of the record and a weighing of the pertinent

considerations, we are not convinced that there are no combination of conditions which will

reasonably assure the safety of the community. To the contrary, we are satisfied that the

general combination of conditions imposed below as now proposed sufficiently ameliorate the

risk of danger created by defendant's release and thus we are constrained to uphold the

magistrate judge and follow the recommendation of release by Pretrial Services. Several

aspects of the record support our determination.

To begin, the first and second of the statutory factors provide irrefutable support for

the government's request for detention. The charged offense is a very serious crime of

violence involving reprehensible conduct that was aimed at victimizing one of society's most

vulnerable members: a young child. The nature of defendant's conduct strikes mortal fear in

the hearts of virtually all parents and is truly upsetting and revolting to most members of our

society. If actually carried to completion defendant's alleged goal would cause great physical

and psychological harm to the victim, and the personal and societal impact on the victim

should not be minimized or be overlooked in any manner. But "[a]s utterly depraved as this

crime is and as forever scarring as it must be to be victimized by it," United States v. Poynter,

495 F.3d 349, 354 (6th Cir. 2007), the record before this court indicates that as to this

defendant the episode that led to the charge appears to be a single incident that more

appropriately is viewed as an aberration as opposed to a pattern of behavior. There is no

competent evidence or information suggesting defendant has acted on any inappropriate

desires in the past, nor are there additional charges (such as possession of child pornography)

or other background information that raise such an inference.

The evidence against defendant is strong.  He made his desires known to a confidential informant and acted in an effort to fulfill those desires.  He rented a motel room, withdrew the needed cash, and continued to communicate with the posing adult intermediary to gain sexual access to a ten year old child.  Most of his behavior was captured on audio recordings.  He was arrested after attempting to open the door of a truck that he assertedly believed contained the child.

The history and characteristics of defendant provide counterbalancing measures.  His education and professional career have been exemplary.  Graduating from William and Mary summa cum laude, defendant went on to graduate from the University of Virginia Medical School and completed a residency and fellowship training at Harvard Medical School, where he served as Chief Resident of Neurology.  Until his arrest he was a specialist in cognitive medicine overseeing a research grant at the University of Pittsburgh designed to further the treatment and cure of Alzheimer's disease and other forms of dementia.   The court has received a significant number of letters from his colleagues at the University School of Medicine and Harvard Medical School, family friends and neighbors, and family members.  Common themes highlighting defendant's compassion, altruism, dedication to work and family and expressing a willingness to provide defendant and his family with whatever emotional support that can be provided abound.  These letters speaks volumes about defendant's character and his past behavior.  They likewise clearly attest to the authors'  belief in defendant's ability to overcome the afflictions underlying his recent behavior through therapy and treatment.  Thus, defendant has put forth persuasive information that sufficiently attests to his good character, employment, family and community ties, which information weighs in favor of defendant's release. Carbone, 793 F.2d at 561.

The fourth factor is the most difficult in any Bail Reform Act case where the congressional presumption of dangerousness has been triggered.  A "grave invasion of the most fundamental of all personal liberties [] occurs when preventive detention" is ordered. United States v. Perry, 788 F.2d 100, 114 (3d Cir. 1986).   And in considering the appropriateness of that invasion the court literally is called upon to make a future prediction

about the likelihood of an individual's propensity to engage in the same or similar conduct if released. That prediction is by necessity an assessment of the secluded world of a detainee's mind and a somewhat speculative prognostication of the detainee's propensity and willingness to act dangerously. Id. ("the dangerousness determination involves a prediction of the detainee's likely future behavior. Such a prediction explores not the external world of past events but the inner territory of the detainee's intentions. By its very nature such a prediction is a far more speculative and difficult undertaking than the reconstruction of past events."). And at the starting point it is presumed that the detainee will in fact act dangerously. Id. ("The detainee is not presumed to intend lawful conduct. Rather it is presumed that he will act dangerously.") Id. (citing 18 U.S.C.A. § 3142(e)).

It is well settled that "[i]n order for a defendant to rebut the presumption that he presents a danger to the community, he must come forward with some credible evidence that he will not continue to engage in the [serious criminal activity] with which he has been charged." United States v. Chagra, 850 F. Supp. 354, 358 (W.D. Pa. 1994) (citing United States v. Hare, 873 F.2d 796, 799 (5th Cir.1989) and United States v. King, 849 F.2d 485, 488 (11th Cir.1988)). In this jurisdiction "a defendant may rebut the presumption through 'testimony by co-workers, neighbors, family, physician, friends, or associates concerning the arrestee's character, health or family situation.'" Id. (quoting United States v. Suppa, 799 F.2d 115, 120 (3d Cir. 1986)); accord Perry, 788 F.2d at 115). As a whole, the letters from defendant's colleagues, friends, neighbors, and family members provide strong foundational support for defendant's "character, family ties, employment, and length of residence in the community." Carbone, 793 F.2d at 561. The authors acknowledge the allegations against defendant and express their belief that defendant has the character and fortitude to obtain any necessary assistance in controlling his future behavior. In addition, Dr. Mark King, the psychologist who interviewed defendant at the Allegheny County Jail, albeit only for an hour and fifteen minutes, has formed the belief that defendant is not likely to engage in inappropriate behavior if released on bail, regardless of whether a condition of house arrest is imposed. As a whole, this body of evidence "[suffices] to rebut the presumption that he

poses a danger to the community." Id.  Thus, only the underpinnings of the allegations giving rise to the presumption and the inferences to be drawn therefrom remain as factors militating against defendant's release.

Having rebutted the presumption, the issue becomes whether the record sufficiently demonstrates that no condition or combination of conditions can reasonably assure the safety community if defendant is released.  U.S.C. § 3142(e).  If not, defendant is to be released under the least restrictive conditions that provide such reasonable assurance.  Id.; United States v. Song, 934 F.2d 103, 105 (7th Cir. 1991).

In analyzing whether it has been established by clear and convincing evidence that the safety of the community cannot be reasonably assured upon the defendant's release, the entire record and the availability and potential effect of any restrictive conditions are to be taken into account.  United States v. Patriarca, 948 F.2d 798, 791 (1st Cir. 1991) (Where government has proven the defendant's release will present a risk of flight and/or safety to the community, including by operation of a statutory presumption, the court is to "proceed to evaluate the conditions to see if they will serve as a reasonable guard." ) (citing United States v. Tortora, 922 F.2d 880, 884 (1st Cir. 1991) ("But if the finding of dangerousness withstands scrutiny, we must then look at the particular conditions imposed by the district court to determine the likelihood that, upon the defendant's release, public safety will nevertheless be reasonably assured.") and United States v. O'Brien, 895 F.2d 810, 816 (1st Cir. 1990) ("The remaining question is whether the court correctly determined, based on all of the facts in this case and giving continuing weight to the presumption, that a combination of conditions existed that reasonably would assure defendant's appearance.")); accord United States v. Traitz, 807 F.2d 322, 325 (3d Cir. 1986) ("the focus of the Bail Reform Act is on whether the conditions or combination of conditions will reasonably assure the safety of the community.").

In analyzing the record and the effectiveness of the available conditions, no "more than an 'objectively reasonable assurance of community safety'" is to be demanded.  Tortora, 922 F.2d at 884 (citing  United States v. Orta, 760 F.2d 887, 892 (8th Cir.1985) (en banc)).  In other words, in undertaking the statutory analysis  it would be improper to loss sight of the

-15-

fact that "the safety of the community can be reasonably assured without being absolutely guaranteed." Id. (citing Orta, 760 F.2d at 891-92). Requiring that the conditions of release provide such a guarantee "would fly in the teeth of Congress's clear intent that only a limited number of defendants be subject to pretrial detention." Id. (citing S.Rep. No. 225, 98th Cong., 2d Sess. 4-12, reprinted in 1984 U.S.Code Cong. & Admin.News 3189, 3187-95); accord United States v. Townsend, 897 F.2d 989, 994 (9th Cir. 1990) ("Only in rare cases should release be denied.").

As previously stated, the dangerousness of repetitive behavior presented by the inferences to be drawn from defendant's alleged attempt to arrange sex with a prepubescent child and the measures and risks he purportedly took to achieve that goal is well established as a general matter. See McKune v. Lile, 536 U.S. 24, 33 (2002) (emphasizing Department of Justice and Federal Bureau of Investigation statistics reflecting substantially increased likelihood of repeat arrests for sex offenders); United States v. Pugh, 515 F.3d 1179, 1199 (11th Cir. 2008) (discussing influence of sexual offender recidivism in passage of various provisions in the PROTECT Act); Report of Chairman Sensenbrenner, H. R. Rep. 107-527, on amendment of 18 U.S.C. § 3583 (expressing congressional determination that "sex offenders and child molesters are four times more likely than other violent criminals to recommit their crimes" and referencing studies and findings documenting (1) a significantly higher rate of recidivism among sexual predators, (2) the number of undetected offenses which such individuals actually commit and (3) the psychological impact such offenses have on the victims); Doe v. Bredesen, 507 F.3d 998, 1006 (6th Cir. 2007) (noting the legislative findings in numerous states passing sex offender registration systems reflecting the "undisputed high risk of recidivism" by such sex offenders). But "[d]etention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant." Tortora, 922 F.2d at 888 (collecting cases in support). "The inquiry is factbound. No two defendants are likely to have the same pedigree or to occupy the same position." Id.

The record supports the proposition that defendant has not engaged in similar conduct

in the past. He has no prior record. The is no evidence of any obsession with child pornography. There is no indication he has used a computer to obtain such materials or to act on any inappropriate desires. From the court's perspective, the charged offense appears to be based on conduct that was closer to an aberration than a chronic and entrenched pattern of behavior. Thus, the question is whether the combination of conditions sufficiently provide reasonable assurance against the prediction of danger to the community that arises under these circumstances. We think they do.[2]

Defendant is to be released to the custody of his parents. Their capacity to serve as third-party custodians has been approved by Pretrial Services and their residence has been inspected and approved. They appear to be exemplary citizens and parents. Defendant is to remain in their home expect for pre-approved travel by automobile for consultation with his attorney, medical consultation and treatment, and pre-arranged visits with his wife and children. He is to travel with an adult who is familiar with the allegations giving rise to the indictment and has taken an oath to uphold the Order of Release. Thus, defendant will at all times both remain under Pretrial Service's electronic monitoring with GPS tracking and be in the presence of a custodial adult sworn to uphold the conditions of release. He is to have no contact with children, including his own, except in the presence of an adult who knows the circumstances of the instant charge and the conditions of release. These conditions in combination significantly diminish defendant's ability to gain any unsupervised contact with children.

Defendant has consented to the monitoring and periodic inspection of all computers, computer equipment, electronic and other communication or data storing devices to which he has access at any time. The monitoring will encompass all forms of electronic communication and storage devises. There is no evidence that defendant has ever used a

---

[2]On this score, we agree with SSA Clemente that the best predictor of future behavior is an individual's past behavior. We just are unwilling to assume or draw an inference that the circumstances underlying the charge is the only or predominant aspect of defendant's past behavior which we are to draw upon in making our prediction about future behavior.

computer to facilitate illegal contact with children or to view and/or collect child pornography. These conditions diminish defendant's ability to have any contact with children through electronic devises and thus further diminish defendant's ability to gain any unsupervised contact with children.

Defendant is required to undergo mental health treatment as directed by Pretrial Services in conjunction with his treating primary mental health provider, Dr. Coufal. A treatment plan will be developed by one of the area's leading clinical psychologists practicing in the area of deviate sexual behavior. The plan will be developed by Dr. Coufal after a thorough preliminary assessment of defendant's condition is made through appropriate testing and followup consultation with other health care providers. It will be designed to prevent any future deviant conduct. It will be based on a competent determination of the diagnostic issues presented, an approach for deviant sexual arousal reduction, an assessment of overall sexual functioning and preoccupation, thorough personality and medical testing as recommended by a forensic psychiatrist, and the identification of all pertinent pathways. Treatment and therapy also will be available to defendant in Virginia as necessary through the services of Dr. Fracher, thus avoiding the need for extensive travel to Pittsburgh solely for ongoing treatment or therapy as deemed appropriate.

Treatment and mental health counseling on this level and thoroughness presents the ability to uncover the underlying components of the affliction underlying defendant's behavior leading to the charges and treat those components in a manner designed to prevent any further deviant behavior. All treatment and/or counseling will be conducted by individuals adhering to the applicable standards utilized in the field. Defendant will be required to follow through and comply with the plan of treatment as a condition of release. This comprehensive approach to treatment significantly diminishes the danger defendant's release presents to the community. See McKune, 536 U.S. at 33 ("Therapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism. See U.S. Dept. of Justice, Nat. Institute of Corrections, A Practitioner's Guide to Treating the Incarcerated Male Sex Offender xiii (1988) ('[T]he rate of

-18-

recidivism of treated sex offenders is fairly consistently estimated to be around 15%,' whereas the rate of recidivism of untreated offenders has been estimated to be as high as 80%. 'Even if both of these figures are exaggerated, there would still be a significant difference between treated and untreated individuals')."); United States v. Kise, 369 F.3d 766, 774 (4th Cir. 2004) ("On this record, it is clear that Kise actively took the initial steps to control, if not wholly eradicate, his disorder thereby minimizing the possibility of recidivism. See Federal Judicial Center, Special Needs Offenders Bulletin No. 3, Sex Offenders 6 (Sept.1998) (stating sexual deviance is treatable and that 'offenders can learn to control, if not eradicate, their deviant interests and behavior,' but for treatment to work 'the offender must be an active participant in identifying risky behavior and in developing coping strategies to address them')") (footnote omitted).

The above-referenced specific conditions plus the standard conditions of the Order of Release combine to provide a reasonable assurance that defendant's release will not present a danger to the community. Thus, defendant must be released under the Bail Reform Act.

In conducting the analysis above and reaching the above decision we have not overlooked the testimony and assessments of SA Clemente. To the contrary, SA Clemente conceded on cross examination that each of the above referenced conditions reduce the risk presented by defendant's release and thus on this level his testimony provides further support for the decision we reach. But we are forced to part company with SA Clemente's analysis and approach to assessing the risk of defendant engaging in repeat behavior and the overall likelihood of harm to children presented by this defendant's release for several reasons.

First, as thoroughly explained by Magistrate Judge Gauvey in Thomas, the persuasiveness of an opinion concerning the risk assessment of future behavior based on the application of the preferential sex offender typology by a non-examining criminal investigative analyst combined with actuarial data is undercut by the lack of sufficient independent testing, validation, empirical research, peer review within any field beyond law enforcement, and established standards of control and verification commonly used in the federal courts to evaluate the reliability of expert testimony. Thomas, 2006 WL 140558 at

*17-21.  And such assessments are further strained by the widely divergent recidivism statistics for sex offenders, the failure to account for or the unexplained discounting of other individual factors commonly accepted as bearing on the potential for recidivism by individuals who have a formal diagnosis of pedophilia,  and the shorter period of time under consideration with regard to pretrial release under the Bail Reform Act.  Id. at 21-23.

Second, SA Clemente did not interview defendant or seek to obtain independent verification of any factors that might undermine or mitigate the potential risk he attributed to defendant's release.  For example, SA Clemente did not have any first hand knowledge of defendant's specific psychological condition.  Instead, he attributed significant weight to the case agent's reporting that defendant on one occasion described his feelings as an obsession, and then implied that such feelings were consistent with the long-term and deep-seated affliction associated with a habitual sex offender, thereby greatly increasing the risk defendant would pose if released.  The context in which the statement was made has not been conveyed to the court and there appears to be no reliable basis for the extrapolation made by SA Clemente, let alone one that would meet the heightened standard applicable to the fact-finding utilized by the court in the context of a detention hearing.  See 18 U.S.C. § 3142(f) ("The facts the judicial officer uses to support a finding that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence."); United States v. Askari, 222 Fed. Appx. 115, 119 (3d Cir. 2007) (defining clear and convincing evidence "as evidence sufficient to 'enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue....'") (quoting In re Adoption of J.J., 511 Pa. 590, 515 A.2d 883, 886 (1986)). Other extrapolations made by SA Clemente, such as defendant likely has sexually fantasized about children for a long period of time, was not concerned about the psychological harm to the victim that would be caused by his conduct,  and will in the future be willing to risk severe consequences in order to attain his desired goal, suffer from the same shortcomings.  And the implication from SA Clemente's assessment and testimony as a whole that defendant may engage in aggressively violent behavior or overt and defiant conduct to overcome any

measures designed to provide containment and restriction from unsupervised access to children is unsupported by any aspect of defendant's past, the allegations underlying the charged offense or any commonly accepted factors bearing on the risk of recidivism that can be fairly attributed to defendant based on the record before the court.

Third, SA Clemente did not give any significant weight a number of factors that tend to militate against any significant risk arising from defendant's release under the conditions being imposed. For example, of the three risk criteria validated through meta-analyses, two of the factors weigh in defendant's favor. The three factors are: 1) the number of previous sexual offenses, the selection of male victims, and the selection of unrelated victims. Thomas, 2006 WL 140558 at *15 (citing Grant T. Harris, Marnie E. Rice & Vernon L. Quinsey, Appraisal & Management of Risk in Sexual Aggressors: Implications For Criminal Justice Policy, 4 Psychol. Pub. Pol'yY & L. 73, 86 (1998)); see also id. at *13 n. 30 (noting The Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR), which consists of four assessment factors: (1) prior sexual offenses; (2) age less than twenty-five; (3) extra-familial victims; and (4) male victims, as being rated as moderately accurate in determining the recidivism risk of the antisocial behavior of sexual offenders in George B. Palermo, M.D., & Mary Ann Farkas, Ph.D., The Dilemma of the Sexual Offender 63 (Charles C. Thomas, Ltd.2001)). There is no evidence that defendant has engaged in a previous sexual encounter with a child and the allegations of the charge involve a female victim. SA Clemente did opine that offenders with a preference for females who select unrelated victims present the next highest risk to those offenders presenting the highest risk, but the assertion that such offenders "present the second highest risk" category provides little more than a reference to the lack of true predictability in seeking to quantify the risk involved. A generalized lack of predictability is not a basis for finding clear and convincing evidence of dangerousness.

Similarly, the absence of any evidence suggesting defendant may be suffering from a co-morbid psychiatric disorder, such as an antisocial personality disorder or psychopathy, or psychological symptoms such as low self-esteem or difficulty in managing anger, or substance

abuse, undercut the contention that defendant presents a high risk for immediate recidivism under conditions of restraint. Id. (citing Peter J. Fagan, Ph.D., Tomas N. Wise, M.D., Chester W. Schmidt, Jr., M.D. & Fred S. Berlin, M.D., Ph.D., Pedophilia, 288 J. Am. Med. Assoc. 2458, 2458 (2002) and R. Karl Hanson, What Do We Know About Sex Offender Risk Assessment?, 4 Psychol. Pub. Pol'yY & L. 50, 57-59 (1998) as identifying such factors as proximate risk factors for the recurrence of pedophilic behavior).[3] Likewise, the fact that defendant has maintained a heterosexual relationship for many years, has children, expressed conflict about his alleged conduct, and has expressed his willing to undergo significant mental health treatment as part of the conditions of release, are matters which SA Clemente acknowledged could have a bearing on the "dynamic" risk assessment confronting the court.[4] His risk assessment did not however seek to take any of these factors into account, except to imply they should all be discounted because it only takes one slip from control for the danger presented by defendant's release to be realized. We are unpersuaded by such reasoning.[5]

---

[3]Of course, the court is not purporting to have the expertise to rule out the presence of such a diagnosis. But defendant's career, working environment and the letters from his peers and colleagues do not suggest the presence of any non-offense behavior that would be consistent with the presence of such a disorder.

[4]Magistrate Judge Gauvey identified the concept of dynamic risk assessment as follows:

To the extent that courts seek to measure the long-term, presumptively stable risk posed by individuals, ARA [actuarial risk assessment] provides the most accurate information. But courts ought to be concerned as well with how risk can be managed and modified in the short and medium-terms, through interventions such as treatment and community supervision. This domain, generally referred to as "dynamic" risk assessment, represents the most recent entree to the scientific literature and will likely be the focus of attention among scientists for the foreseeable future.

Id. at *14.

[5]Compare Thomas, 2006 WL 140558 at *24:

In summary, while SSA Clemente repeatedly stated that he could not predict what this defendant would do if released, he nevertheless insinuated that because there is admittedly very strong evidence that the defendant committed

Finally, the government's arguments concerning the force of the prior precedent in this District are wide of the mark. Detention determinations are by their very nature fact-bound assessments that must be based on the evidence pertaining to the particular defendant before the court. United States v. Traitz, 807 F.2d 322, 325 (3d Cir. 1986) ("Each case, of course, is *sui generis*, and must be decided on the basis of the particular record adduced."); Tortora, 922 F.2d at 888 (same). Magistrate Judge Hay recognized as much when she denied the government's request for detention notwithstanding her decisions of detention in United States v. Brian Lee Nestor, 2:07cr369 and United States v. James Smith, 2:07cr184. And as the above makes clear, there were ample grounds in this case to support her determination that a combination of conditions could be fashioned to provide reasonable assure of the safety of the community upon defendant's release, which is all that has been joined for judicial determination.

Moreover, each of the above cases are distinguishable. In both Nestor and Smith there was substantial evidence indicating that in addition to a § 2422 charge or its equivalent the defendant had used the internet to exchange and collect child pornography and to otherwise search for opportunities to engage in illegal sexual conduct. See Complaint and Affidavit of Agent Bellissimo (Doc. No. 1) and Indictment (Doc. 26) at 2:07cr184; Affidavit of Agent Szczepanski (Doc. 1-1) and Indictment (Doc. No. 18) at 2:07cr369. SA Clemente previously has stated under oath that in his view amassing a collection of child pornography is the single most telling sign of a "preferential child sex offender," and thus by implication a telling sign of an offender with a high risk of recidivism under the BAU's method of classification. Thomas, 2006 WL 140558 at *4. The lack of such conduct in the instant record and the lack of any evidence of prior conduct pertaining to the sexual exploitation of children provided

---

one act of molestation, that he most likely has committed others and will undoubtedly commit more. This is circular reasoning at best, and without more, cannot serve as clear and convincing evidence of a reoffense risk in a detention determination.

additional reasons for reaching differing conclusions as to the likely effectiveness of the available restrictive conditions. In addition, Nestor had a well documented history of engaging in the very activity with which he had been charged. <u>See</u> Szczepanski Affidavit (Doc. 1-1) in 2:07cr369 at ¶ 15. Thus, there are ample bases in the instant record to support the magistrate judge's implicit determination that the present circumstances are distinguishable from the prior cases referenced by the government and the explicit determination that release of defendant under a combination of restrictive conditions is sufficient to a provide reasonable assurance of safety to the community.

Because we are satisfied after *de novo* review that the combination of conditions being imposed serve to provide a reasonable assurance of safety to the community against the risk posed by defendant's release, the Order of Release entered by Magistrate Judge Hay must be affirmed.

<u>Date: May 1, 2008</u>

<u>s/ David Stewart Cercone</u>
David Stewart Cercone
United States District Judge

cc:    Soo C. Song, AUSA

       Paul D. Boas, Esquire
       Law and Finance Building
       429 Fourth Avenue
       Pittsburgh, PA  15219

       United States Marshal Service